**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aaron Gardner, | No. CV-20-01518-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| G.D. Barri & Associates Incorporated, | |
| Defendant. | |

Plaintiff Aaron Gardner was a well-paid construction manager for Defendant G.D. Barri & Associates, Inc. ("GD Barri"). Gardner often worked more than forty hours per week, but he was not paid overtime. Gardner filed this suit alleging the failure to pay him overtime violated the Fair Labor Standards Act ("FLSA"). The Court conditionally certified an FLSA collective covering Gardner and other GD Barri employees who allegedly were subject to the same compensation arrangement. After being notified of this case, 131 other individuals joined as plaintiffs. The parties completed discovery and filed cross-motions for partial summary judgment. Viewing the facts in the light most favorable to GD Barri, its compensation arrangement violated the FLSA. Therefore, Gardner's motion for partial summary judgment will be granted and GD Barri's motion, in large part, will be denied.

## BACKGROUND

The parties have provided very little information regarding the factual background of this case. All that is disclosed is "GD Barri is a staffing firm that specializes in the

power industry." (Doc. 87 at 2). Apparently, GD Barri's business consists of hiring individuals and arranging for those individuals to work on-site at power companies. The individuals GD Barri hires are highly skilled and are expected to perform complex tasks, including management of other employees. For example, GD Barri hired Gardner to work as a Construction Manager at the Palo Verde Nuclear Power Plant operated by Arizona Public Service Company.

The parties have not provided meaningful information regarding the daily job duties of Gardner or the other plaintiffs (collectively, "Plaintiffs"). The parties merely state Plaintiffs held a variety of different job titles, such as "Safety Advisor" and "Trainer." (Doc. 87-1 at 5). Based on their titles, Plaintiffs likely were performing very different types of work. However, the parties agree GD Barri compensated all Plaintiffs under the same compensation arrangement consisting of a small "weekly salary" plus a per-hour bonus rate.

GD Barri's compensation arrangement was set out in its "Employee Agreements" Plaintiffs signed when they started work. Those agreements allegedly promised a weekly salary in an amount taken from a regulation establishing the minimum permissible weekly salary for "highly compensated employees." 29 C.F.R. § 541.601. Prior to January 1, 2020, the regulation mandated at least a weekly salary of $455.00, and that was the amount identified in GD Barri's compensation arrangement at that time. A regulatory change took effect as of January 1, 2020, that increased the minimum weekly salary to $684.00. Accordingly, GD Barri updated its compensation arrangement to reflect a minimum weekly salary of $684.00 as of that date. (Doc. 89-1 at 10).

Each Employment Agreement stated the guaranteed weekly salary of either $455 or $684 was "based on the expectation [the plaintiff would] work at least 40 hours a week on the job." (Doc. 87-2 at 2). It is misleading, however, to view the identified weekly salary as reflecting how much GD Barri and Plaintiffs expected Plaintiffs would be paid if Plaintiffs worked forty hours in a week. In fact, GD Barri and Plaintiffs expected Plaintiffs would be paid many multiples of their allegedly guaranteed minimum weekly salary.

The amount of weekly compensation Plaintiffs expected was reflected in each Employment Agreement as the product of an hourly "bonus."  The "bonus" was an hourly rate that would be earned after a plaintiff had worked a few hours.  The "bonus" hourly rate usually was between $30 and $75 per hour.  The minimum weekly salary (either $455 or $684) was divided by the "bonus" hourly rate to determine the number of hours after which payment of the "bonus" rate would begin.  For example, Gardner was promised $455 per week and his "bonus" rate was $75 per hour.  Dividing $455 by $75 meant it would take Gardner 6.06 hours to earn $455.  Therefore, Gardner's Employment Agreement stated he would receive a salary of $455 per week and he would "be paid a bonus of $75.00 per hour" for each hour he worked over 6.06.[1]

Gardner's "bonus" of $75 per hour applied no matter how many hours he worked in a week.  In other words, Gardner was not paid a premium for working more than forty hours in a week.  If, for example, Gardner worked 50.06 hours in one week, his gross pay would have been $3,755.[2]  That total could be viewed as calculated in two ways.  First, it could be viewed as his weekly salary of $455 (representing the first 6.06 hours) plus his "bonus" of $3,300 (representing $75 per hour for 44 hours).  Second, his gross pay could be viewed as simply his "bonus" rate of $75 multiplied by the total hours of 50.06.  GD Barri's compensation arrangement, as set forth in the Employment Agreements, purported to be using the first method of calculation.[3]  However, other evidence establishes the arrangement's actual operation repeatedly employed the second type of calculation.  In fact, GD Barri's documents and pay practices show that GD Barri viewed Plaintiffs as hourly, not salaried, employees.[4]

---

[1] Each Employment Agreement also stated it was GD Barri's "intention to enter into a weekly salary arrangement.  The additional payment is intended as a bonus payment and will not be construed as an intention to pay you for services on an hourly basis." (Doc. 89-1 at 2).
[2] This is rounded to the whole dollar.
[3] The Employment Agreement, however, was not entirely consistent in describing the compensation arrangement as salary based.  In one section the Employment Agreement stated "[d]iscussion of your **hourly compensation** with other contractors, will be grounds for immediate termination as directed by these agreements." (Doc. 89-1 at 3) (emphasis added).  And in another section the agreement stated Gardner may be eligible for "holiday pay (8 hours for each approved holiday, maximum)." (Doc. 89-1 at 4).
[4] Much of the evidence regarding GD Barri's descriptions of its compensation arrangement

The first piece of evidence regarding how GD Barri viewed Plaintiffs is an email chain between GD Barri's "Executive Vice President/CFO" and GD Barri's outside counsel. That chain from 2017 explains why GD Barri adopted this particular compensation arrangement. GD Barri's CFO stated the company "implemented the minimum salary plus bonus structure to respond to the fact that the customer expects professional employees to be billed at straight time for overtime instead of time and one half." (Doc. 89-8 at 7). Counsel responded overtime "must" be paid in certain circumstances. (Doc. 89-8 at 5). The CFO responded that Plaintiffs meet "all the requirements (duties, wage rates, etc.)" to qualify as salaried employees but "**the only thing that makes them hourly** is I can't afford to be liable for someone's full salary every week since I can only bill the client hourly." (Doc. 89-8 at 5) (emphasis added). Thus, as early as 2017 GD Barri's CFO viewed its compensation arrangement as involving hourly employees. (Doc. 89-8 at 5).

Other evidence regarding GD Barri's view of Plaintiffs as hourly employees is the offer letters GD Barri sent to Plaintiffs. Gardner's offer letter stated, in relevant part, "Our client, APS Palo Verde Generating Station, wishes to offer you the position of Construction Manager at Palo Verde at the rate of $75.00." (Doc. 89-12 at 2). That letter went on to note that, after Gardner had worked for twelve months, his "regular wage may be increased by up to $8.00 an hour." (Doc. 89-12 at 2). The offer letter contains no indication Gardner would be a salaried employee with a minimum guaranteed salary.

Another piece of evidence is the internal document GD Barri used when a new employee started. That document, titled "HIRE FORM," indicated Plaintiffs were hourly employees in that it listed a standard and overtime rate with no mention of a minimum weekly salary. Gardner's "HIRE FORM" listed his "ST RATE" as $75.00 and his "OT RATE" as $75.00. (Doc. 89-9 at 2).

Yet more evidence GD Barri viewed Plaintiffs as hourly employees is found on Plaintiffs' pay stubs. Gardner's pay stub for October 8, 2018 through October 21, 2018

---

comes from documents specifically related to Gardner. GD Barri does not argue the documents for other Plaintiffs would be different.

- 4 -

stated he worked a total of 126 hours: 80.00 regular hours and 46.00 overtime hours. (Doc. 89-7 at 5). The pay stub identified his "pay rate" as 75.00 for both types of hours. And the pay stub reflected Gardner's gross pay as simply 126 hours at $75 per hour for a total of $9,450. The pay stubs for other weeks, and other employees, show the same type of calculation. (Doc. 89-7 at 2-9).

While this evidence points towards GD Barri viewing Plaintiffs as hourly employees, the most important evidence for purposes of summary judgment is how Plaintiffs who worked only a few hours in particular weeks were paid. From 2018 through mid-2021, there were instances involving fourteen plaintiffs who worked at least one hour in a week but were not paid the allegedly guaranteed minimum weekly salary.[5] (Doc. 89-4). For example, plaintiff Jack Scheible only worked four hours during a week in early 2020. Scheible's allegedly guaranteed weekly salary at that time was $684.00. Scheible, however, was paid only $231.00 for the week. Because Scheible's "bonus" rate was $57.75 per hour, his total pay of $231.00 represented his hourly rate multiplied by the number of hours (*i.e.*, $57.75 multiplied by four is $231.00). (Doc. 89-4 at 2). The same type of calculation was done for thirteen other plaintiffs. GD Barri now claims, as addressed in more detail below, Plaintiffs were never promised a minimum weekly salary but only a minimum amount per pay period.

Based on these documents and pay practices, Plaintiffs seek partial summary judgment that GD Barri cannot establish Plaintiffs were exempt from the FLSA's overtime requirement. GD Barri's cross-motion for summary judgment is, in large part, a mirror image of Plaintiffs' motion. That is, GD Barri seeks summary judgment that over 100 "of the individuals who have consented to join this action [were] . . . exempt from the overtime requirements imposed by the FLSA" for at least part of the time at issue. (Doc. 87 at 12). GD Barri also seeks summary judgment against certain individuals who allegedly did not

---

[5] Plaintiffs identified sixteen plaintiffs but GD Barri argues it was not required to pay the full salary for two of those plaintiffs (Frederick Moultrie and Melissa Woody) because "they elected to take unpaid time off" during the weeks at issue. (Doc. 91 at 7). For purposes of summary judgment, the Court will accept that as true. GD Barri does not, however, claim the other listed plaintiffs elected to take unpaid time off or provide any other explanation for the failure to pay the minimum weekly salary.

- 5 -

submit a valid consent to join this case or were "not employed during the relevant period." (Doc. 87 at 12).

## ANALYSIS

### I. Cross-Motions for Summary Judgment

When presented with cross-motions for summary judgment on the same claim, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). After considering the evidence submitted in connection with both motions, the Court must address each motion under the governing standard. Thus, the Court must "determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

### II. Plaintiffs Were Not Paid on "Salary Basis"

"The FLSA requires that employers pay overtime compensation for all hours worked in excess of forty hours in a week unless a particular exemption applies." *Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011). As the employer, GD Barri "bears the burden of establishing that it qualifies for an exemption under the [FLSA]." *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016). The exemption at issue in this case is for "highly compensated employees."[6] GD Barri seeks summary judgment that the exemption applied to most Plaintiffs while Gardner seeks summary judgment that it did

---

[6] The FLSA does not explicitly identify an exemption for "highly compensated employees." Rather, the FLSA establishes an exemption for "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The Department of Labor established the "highly compensated employee exemption" in a regulation to provide "a less burdensome way to prove an executive, administrative, or professional exemption." *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 n.2 (8th Cir. 2020). In other words, the "highly compensated employee" exemption is a special application of the statutory exemptions, "not a separate exemption." *Id.* The parties do not believe this nuance is important and they both refer to the applicability of the "highly compensated employee" exemption as the crucial issue in the present case.

- 6 -

not apply to any Plaintiff.[7] Viewing all the evidence supplied by the parties in the light most favorable to GD Barri, there is no dispute of material fact that the "highly compensated employee" exemption did not apply to any Plaintiff.

As set forth in an earlier Order in this case, the "highly compensated employee" exemption from overtime eligibility requires an employee "(1) receive total annual compensation of at least $100,000.00 or [$107,432 after January 1, 2020], which must include at least $455 [or $684 after January 1, 2020] per week paid on a salary or fee basis; (2) customarily and regularly perform[ ] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee; and (3) have a primary duty that includes performing office or non-manual work." *Gardner v. G.D. Barri & Assocs. Inc.*, No. CV-20-01518-PHX-MTL, 2021 WL 1376063, at *4 (D. Ariz. Apr. 12, 2021) (citing 29 C.F.R. § 541.601). The parties agree all three of these requirements must be met for the exemption to apply and their cross-motions address, to some degree, each requirement. However, the Court need only address whether there is a genuine dispute of material fact that Gardner and others were paid on a "salary basis."

The starting regulation for determining if an employee was paid on a "salary basis" is 29 C.F.R. § 541.602. Under that regulation, an employee is paid on a "salary basis" if "the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). This means an employee must "receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.602(a)(1).

---

[7] GD Barri's filings are contradictory. GD Barri's motion for partial summary judgment argues there is no dispute of material fact that most of the plaintiffs "qualify under the highly compensated employee exemption." (Doc. 87 at 4). But in opposing Gardner's motion for partial summary judgment, GD Barri argues "there is a genuine dispute of material fact as to whether GD Barri's employees were exempt from overtime requirements." (Doc. 91 at 2). GD Barri's opposition also argues "[t]here is sufficient evidence to go to a jury" on the applicability of the highly compensated employee exemption. (Doc. 91 at 4). Based on these filings, it is not clear why GD Barri sought summary judgment on an issue only to argue, a few weeks later, the exact same issue involves a "dispute of material fact."

The impact of an employer making "improper deductions from salary" is explored in detail at 29 C.F.R. § 541.603. That regulation states an

> employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis.

29 C.F.R. § 541.603(a). The regulation identifies a non-exhaustive list of "factors to consider when determining whether an employer has an actual practice of making improper deductions." *Id.* The listed factors are:

1. the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline;
2. the time period during which the employer made improper deductions;
3. the number and geographic location of employees whose salary was improperly reduced;
4. the number and geographic location of managers responsible for taking the improper deductions; and
5. whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

*Id.*

That same regulation makes clear a particular employee need not suffer an improper deduction before that employee will be viewed as not being paid on a "salary basis." Instead, if an employer has an "actual practice" of making improper deductions from certain classes of employees, the exemption will not apply to any employee in the relevant class. The regulation gives the following example:

> [I]f a manager at a company facility routinely docks the pay of engineers at that facility for partial-day personal absences, then all engineers at that facility whose pay could have been improperly docked by the manager would lose the exemption; engineers at other facilities or working for other managers, however, would remain exempt.

29 C.F.R. § 541.603(b).

As applied to the present case, the regulations establish Plaintiffs were properly

classified as "highly compensated employees" exempt from overtime if, and only if, they were paid predetermined amounts that could not be reduced based on "the quality or quantity of the work performed." If, however, GD Barri had a widespread practice of making improper deductions from Plaintiffs' salaries, the overtime exemption did not apply to any Plaintiff.

As noted earlier, there were at least fourteen plaintiffs who were subject to improper deductions. (Doc. 89-4 at 2). Those plaintiffs performed work during a week but did not receive their allegedly guaranteed weekly salaries. Instead, those plaintiffs were paid an amount equal to their "bonus" rate multiplied by the number of hours worked. Cast in terms of the regulatory language, those plaintiffs suffered improper deductions from their guaranteed salaries based on hours not worked. For example, Plaintiff Kelvin Dougherty had a "bonus" rate of $40 per hour. For a pay period in March 2021, Dougherty's allegedly guaranteed weekly "salary" was $684.[8] However, one week Dougherty worked only ten hours. For that week, he was paid $400, not the $684 allegedly guaranteed. (Doc. 89-4 at 2). GD Barri does not dispute this occurred. Rather, GD Barri argues Dougherty was still paid on a "salary basis," just a different salary than what he was promised.[9]

According to GD Barri, the deductions for Dougherty's salary and the others were permissible because "[t]he total pay for almost every biweekly pay period listed by Plaintiffs adds up to more than the mandatory minimum set forth under the relevant regulation." (Doc. 92 at 4). The regulation GD Barri is referencing states "[t]he required amount of compensation per week may be translated into equivalent amounts for periods longer than one week. For example, the $684–per-week requirement will be met if the

---

[8] There is an error in the table Plaintiffs submitted on this point. That table reflects Dougherty was entitled to $684 and was paid $400, but the table identifies that as a difference of only $55. The correct difference is $284.

[9] GD Barri also argues "Plaintiff does not explain why any identified deductions were made or what was 'improper' about them." (Doc. 91 at 6). It is not clear what GD Barri means. GD Barri, as the employer, is the party who is in the best position to know why the "identified deductions were made." Moreover, Gardner's entire argument is the deductions were "improper" because GD Barri purported to be paying him a guaranteed weekly salary. GD Barri's professed ignorance why Gardner believes the deductions were "improper" is not convincing. And finally, the burden of establishing the applicability of the exemption was on GD Barri. GD Barri's failure to establish the deductions were proper is fatal to its position that the exemption applied.

- 9 -

employee is compensated biweekly on a salary basis of not less than $1,368 . . . ." 29 C.F.R. § 541.600(b). Thus, GD Barri believes it can still claim Dougherty and the other plaintiffs were paid on a "salary basis" despite weekly deductions because Dougherty and others almost always received at least $1,368 for a two-week pay period. This argument is inconsistent with GD Barri's actual compensation arrangement as a matter of text and math.

It is undisputed Plaintiffs were told they were salaried employees who would receive either $455 or $684 each week. GD Barri's current position that it merely promised a "biweekly" amount finds no support in the underlying documents. And GD Barri does not cite any authority establishing it can change its compensation arrangement from a weekly to biweekly guarantee whenever it would be advantageous to do so. But even more importantly, the regulations require the salary be a "predetermined amount" and the fourteen plaintiffs were not paid the proper amount under the formula explicitly set forth in GD Barri's compensation arrangement. 29 C.F.R. § 541.602(a).

The compensation arrangement promised a minimum weekly salary plus a bonus amount based on the number of hours an employee worked in a particular week. The amount paid to some plaintiffs, however, did not correspond to this "salary plus bonus" arrangement. Using Dougherty as an example, the pay period for which he suffered improper deductions consisted of ten hours of work one week and thirty hours of work the second week. His pay records reflect he received $400 for the first week and $1,200 for the second week. GD Barri proposes these two should be added together such that Dougherty received $1,600 for the two-week period. That amount was more than the $1,368 biweekly amount required by the regulation if Dougherty had been promised a biweekly minimum amount. But GD Barri's compensation arrangement was that Dougherty would receive no less than $684 for each week in which he performed any work. Dougherty was further promised that, in any week in which he performed more than $17.1^{10}$ hours of work, he would receive a "bonus" of $40 per hour. Using the "predetermined

---

[10] This is the minimum of $684 divided by the "bonus" rate of $40.

amount" promised by GD Barri, Dougherty should have received the following: 1) $684 for the first week where he worked ten hours; 2) $1,200 for the second week where he worked 30 hours. Thus, under the "predetermined amount" promised by GD Barri, Dougherty should have received $1,884 for the two-week period. Instead, he received a total of $1,600. The only possible conclusion is that G.D. Barri made improper deductions Dougherty's compensation based on hours not worked.[11] In other words, Dougherty was treated as if he was an hourly, not salaried, employee.

The fact that GD Barri made deductions from the allegedly guaranteed minimum weekly salaries promised to some Plaintiffs is consistent with other evidence showing Plaintiffs were viewed as hourly employees. The email chain between GD Barri's CFO and outside counsel, Plaintiffs' offer letters, GD Barri's internal documents when Plaintiffs were hired, and Plaintiffs' pay stubs all show GD Barri viewed Plaintiffs as hourly employees. This documentary evidence on its own may not be sufficient to conclude Plaintiffs were viewed as hourly employees. *See McGuire v. City of Portland*, 159 F.3d 460, 464 (9th Cir. 1998) (noting employer's "accounting procedures" indicating hourly employment were not sufficient to establish plaintiffs were "in fact hourly employees"). But this evidence, together with the pervasive actual practice of deducting pay based on the number of hours Plaintiffs worked, establish Plaintiffs were not paid on a "salary basis."

Trying to avoid the conclusion that some Plaintiffs were treated as hourly employees, GD Barri points to testimony from its CEO. According to the CEO, when Plaintiffs performed any work in a week, Plaintiffs were paid their full minimum salary. The CEO testified "if an employee works during the week, they're entitled to their guaranteed salary, be it one hour, one day, they're guaranteed their salary." (Doc. 89-2 at 22). GD Barri does not explain, however, how this testimony is consistent with the pay records. At least fourteen plaintiffs were paid less than their promised weekly salaries at various times over the course of three years. This practice of improper deductions from

---

[11] GD Barri's CEO testified in her deposition that Plaintiffs are paid a "weekly salary" and "a salary is a periodic payment, that is not variable by definition." (Doc. 89-2 at 34, 35). Throughout the deposition of the CEO there is no indication Plaintiffs were to be compensated based on a biweekly minimum.

- 11 -

allegedly guaranteed weekly salaries overcomes GD Barri's putative intent.[12] *See Klem v. Cnty. of Santa Clara, California*, 208 F.3d 1085, 1091 (9th Cir. 2000) (noting Department of Labor follows "objective intention to pay [] employees on a salaried basis" not an employer's "subjective intention").

Over the course of three years, and across at least fourteen different employees, GD Barri made improper deductions from allegedly guaranteed weekly salaries. The pay decisions for all Plaintiffs were controlled by GD Barri, apparently at a single location. And GD Barri has not cited any formal policy in effect at the relevant times that forbade the improper deductions. Moreover, even if a policy existed, GD Barri has not provided any explanation why that alleged policy was violated repeatedly during a three-year period and across many employees. These undisputed facts establish, under the test contemplated in 29 C.F.R. § 541.603(a), GD Barri had an "actual practice" of making improper deductions.

When an employer has an "actual practice" of improper deductions, the next step usually requires identifying the employees potentially subject to that practice. Here, GD Barri does not point to any evidence establishing material differences amongst Plaintiffs, such as the deductions being the result of independent decisions by different managers. Accordingly, no Plaintiff was properly classified as exempt. Deeming all Plaintiffs non-exempt from overtime may be harsh. But the present situation is markedly different from that presented in other cases where no "actual practice" of improper deductions was found.

Decisions by the Seventh Circuit and Tenth Circuit provide some guidance regarding the type of deductions that are insufficient to establish an "actual practice" of improper deductions. In 2005, the Seventh Circuit held an employer did not have an "actual practice" of improper deductions despite evidence the employer "impermissibly docked small portions of three of the plaintiffs' wages." *Kennedy v. Commonwealth*

---

[12] GD Barri insists it labeled its compensation arrangement as built around a "salary." But the FLSA is concerned with the reality of a compensation arrangement, not the label given to that arrangement by the employer. *See Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA.").

*Edison Co.*, 410 F.3d 365, 372 (7th Cir. 2005). Those deductions were not sufficient to establish an actual practice because "[t]here was no pattern to the deductions and they occurred over the equivalent of 470,000 work weeks." *Id.* The Seventh Circuit concluded "[i]dentifying a few random, isolated, and negligible deductions is not enough to show an actual practice." *Id.*

Similarly, the Tenth Circuit concluded there was no "actual practice" where a single improper deduction was made. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1195 (10th Cir. 2015). The plaintiff in that case had worked for the employer approximately five years and she experienced an allegedly improper deduction of approximately thirty dollars a single time. *Id.* at 1189-90.

Here, the undisputed evidence shows GD Barri repeatedly made improper deductions, over at least three years, and the deductions were for hundreds of dollars. Unlike the Seventh Circuit case, GD Barri's deductions were not "random." Rather, they tracked weeks when certain Plaintiffs did not work a sufficient number of hours to earn their allegedly guaranteed minimum salary on a per-hour basis. And the present situation is not like what the Tenth Circuit faced either. GD Barri's repeated deductions cannot be written off as equivalent to a single occurrence over a five-year period. GD Barri has not offered any evidence showing a plausible way to avoid the conclusion that, under the factors in 29 C.F.R. § 541.603, it had an "actual practice" of improper deductions. Therefore, GD Barri cannot rely on the "highly compensated employee" exemption for any Plaintiff.

If GD Barri had paid Plaintiffs consistently on a "salary basis" as that term is defined by regulation, the Court would need to go on and address whether Plaintiffs met the other aspects of the "highly compensated employee" exemption. But because they were not compensated on a "salary basis," Plaintiffs are entitled to summary judgment that they were not exempt from overtime.

### III.     Allegedly Untimely Consents

GD Barri seeks summary judgment against six employees who allegedly "did not

timely file their consents" to join this case. (Doc. 87 at 9). GD Barri's argument, however, misunderstands the action each employee was required to take by the applicable deadline.

On June 17, 2021, the Court granted Gardner permission to send notices to other GD Barri employees advising them of this case and giving them the opportunity to join it. (Doc. 62). The Court also adopted a schedule that stated employees would have sixty days from the date notice was mailed "to return their signed Consent forms to Plaintiff's counsel for filing with the Court." (Doc. 50-13 at 2). Based on the date notice was mailed, the deadline for employees to return their consent forms to counsel was September 24, 2021. (Doc. 96 at 11).

GD Barri now seeks summary judgment that six employees did not *file* their consent forms by September 24, 2021. (Doc. 87 at 9). But there was no such requirement. Rather, September 24 was the deadline for employees to return their signed consent forms to counsel. Five of the six employees identified by GD Barri signed their consent forms on or before September 24, 2021. (Doc. 75, 76). It is possible, therefore, those consent forms were provided to counsel by the deadline. GD Barri has not established those five employees cannot participate in this case based on when their consents were filed. GD Barri's motion for partial summary judgment will be denied regarding these five employees.

One employee, Thomas Simpson, Jr., did not sign his consent form until November 8, 2021. (Doc. 80 at 3). That form could not have been timely provided to counsel by the applicable deadline. Therefore, the claims asserted by Thomas Simpson, Jr., will be dismissed without prejudice.

**IV.  Frederick Moultrie**

GD Barri seeks summary judgment against Frederick Moultrie because he "did not sign a notice of consent in this case." (Doc. 87 at 9). It is undisputed a consent form allegedly on behalf of Moultrie was filed on August 5, 2021. (Doc. 65 at 12). However, that form was unsigned. Plaintiffs now argue the lack of signature was a "clerical error" and Plaintiffs filed a form, signed by Moultrie, dated August 3, 2021. (Doc. 94 at 16, Doc.

94-1 at 2). GD Barri does not address Moultrie in its reply brief, effectively conceding the validity of Moultrie's consent now on file. Therefore, GD Barri's motion for summary judgment regarding Moultrie will be denied.

## V.    Mark Jurash

GD Barri seeks summary judgment against Mark Jurash, claiming he "was not employed by G.D. Barri during the relevant time." (Doc. 87 at 9). In support, GD Barri submitted an affidavit from its Chief Financial Officer stating "Mark Jurash was employed by GD Barri from August 20, 2013 to September 25, 2014." (Doc. 87-1 at 2). That affidavit does not state Jurash was only employed during that period. Plaintiffs oppose summary judgment on precisely that point, arguing the affidavit is "not evidence [Jurash] wasn't employed during the relevant period." (Doc. 94 at 16). In its reply, GD Barri does not mention Jurash. Viewed in the light most favorable to Jurash, GD Barri has not established he did not work during the relevant period. GD Barri's request for summary judgment regarding Jurash will be denied.

## VI.   Remaining Proceedings

The parties will be required to file a joint status report indicating whether there remain any disputes of fact for trial and, if not, whether any issues of law remain. If no trial is necessary, the parties shall explain what additional motion practice is necessary to resolve this case.

Accordingly,

**IT IS ORDERED** the Motion for Partial Summary Judgment (Doc. 88) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motion for Partial Summary Judgment (Doc. 87) is **DENIED IN PART and GRANTED IN PART**. Plaintiff Thomas Simpson, Jr., is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** the Motion for Hearing (Doc. 97) is **DENIED**.

…

…

**IT IS FURTHER ORDERED** no later than **August 12, 2022**, the parties shall file a joint statement explaining whether a trial is necessary and, if not, what additional motion practice is necessary.

Dated this 1st day of August, 2022.

Honorable Roslyn O. Silver
Senior United States District Judge